IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **DASSAULT SYSTEMES DEUTCHLAND GMBH, and DASSAULT SYSTEMES SOUTH AFRICA (PTY) LTD,**<br>　　　　　**Plaintiffs/Counter-Defendants,**<br><br>　　　　v.<br><br>**SASHA RAJCEVICH,**<br>　　　　　**Defendant/Counter-Claimant.** | CIVIL ACTION<br><br><br><br>NO. 23CV4490 |

**MEMORANDUM OPINION**

When Dassault Systemes Deutschland GmbH. and Dassault Systemes South Africa (PTY) Ltd. (collectively, "Dassault") sued Sasha Rajcevich for copyright infringement, he responded with a bevy of counterclaims, including defamation, invasion of privacy, and intentional infliction of emotional distress. Dassault now moves to dismiss those counterclaims pursuant to Federal Rule of Civil Procedure 12(b)(6), arguing that some are barred by the applicable statute of limitations, and that the remainder fail to state a claim. For the reasons that follow, the motion will be granted.

I.　　FACTUAL BACKGROUND

According to its Complaint, Dassault is the creator, author, and owner of two copyrighted software packages: CST Studio Suite, which is used for 3D electromagnetic analysis, and Antenna Magus, which is used for antenna design and modeling. Both software packages incorporate monitoring technology that detects unauthorized uses and transmits identifying data to Dassault when such uses occur. Through this monitoring technology, Dassault detected 269 uses of unlicensed copies of CST Studio Suite and 66 uses of unlicensed copies Antenna Magnus

1

on two different computers.  That monitoring technology further yielded: Wi-Fi geolocation data, which showed that the unauthorized uses occurred when the laptops were located at Rajcevich's addresses of record; data indicating that the username on both computers was "sasha"; and data indicating that email addresses affiliated with Rajcevich were used to send and receive emails from the computers.  Based on these facts, Dassault concluded that Rajcevich was using unlicensed copies of its software.

Upon identifying these unauthorized uses of CST Studio Suite and Antenna Magnus, Dassault initially attempted to resolve the matter privately.  In September 2022, it contacted Rajcevich's employer—Cobham Advanced Electronic Solutions ("CAES")—stating that he had infringed its software and requesting an investigation.  About a month later, CAES informed Dassault that "[a]fter extensive investigation by the CAES team, we have determined that Sasha [Rajcevich] did not utilize the CST software for any of his responsibilities at CAES."  After receiving this confirmation, Dassault next contacted Rajcevich directly, demanding that he "immediately cease and desist [his] infringing activities."  The email further requested that Rajcevich contact Dassault "at the earliest convenience in order to work out an amicable resolution to this matter."

About six months later—*i.e.*, in March 2023—Rajcevich responded, denying that he had improperly used Dassault's software and suggesting that his computers "must have been hacked."  He further stated that the piracy accusation against him had led to "irreparable reputational damage throughout CAES," and he threatened legal action if Dassault continued to press its claims.  The parties exchanged several more emails over the ensuing weeks, with Dassault pointing to the previously discussed evidence of infringement and Rajcevich denying the evidence's authenticity.  He ultimately requested that Dassault direct all further

communications to his attorney.

About eight months later, Dassault filed suit against him, alleging federal copyright infringement, 17 U.S.C. § 501, and circumvention of technological measures, 17 U.S.C. § 1201. In his responsive pleading, Rajcevich denied these claims, and he further raised eight counterclaims of his own.  Four of these counterclaims—defamation, false light invasion of privacy, tortious interference with business relations, and intentional infliction of emotional distress—stemmed from Dassault's communications with CAES, which Rajcevich alleged contained false accusations.  The remainder—interception of electronic communications, theft of personal information, federal unlawful access to electronic communications, and state unlawful access to electronic communications—stemmed from Rajcevich's allegations regarding the operations of Dassault's software monitoring technology.  These eight counterclaims are the subject of this present motion.

## II.     LEGAL STANDARDS

A motion to dismiss a defendant's counterclaims is evaluated under the same standard as a motion to dismiss the complaint.  *Mr. Sandless Franchise, LLC v. Karen Cesaroni LLC*, 498 F.Supp.3d 725, 732 (E.D. Pa. 2020).  To survive under this standard, the defendant's pleadings "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*  "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.*  When analyzing a motion to dismiss, the complaint must be construed "in the light most favorable to the plaintiff," with the

3

question being "whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief." *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210 (3d Cir. 2009) (citation omitted). Legal conclusions are disregarded, well-pleaded facts are taken as true, and a determination is made as to whether those facts state a "plausible claim for relief." *Id.* at 210-11.

"In deciding a Rule 12(b)(6) motion, a court must consider only the complaint, exhibits attached to the complaint, matters of public record, as well as undisputedly authentic documents if the complainant's claims are based upon these documents." *Mayer v. Belichick*, 605 F.3d 223, 230 (3d Cir. 2010). Document "integral to or explicitly relied upon in the complaint" may also be considered without converting a motion to dismiss into one for summary judgment. *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1426 (3d Cir. 1997) (citation omitted and emphasis removed).

### III. DISCUSSION

#### A. Counterclaim I: Defamation

In Pennsylvania,[1] a claim for defamation has seven elements: 1) the defamatory character of the communication; 2) its publication by the defendant; 3) its application to the plaintiff; 4) the understanding by the recipient of its defamatory meaning; 5) the understanding by the recipient of it as intended to be applied to the plaintiff; 6) special harm resulting to the plaintiff from its publication; and, 7) abuse of a conditionally privileged occasion. 42 Pa. C.S. § 8343(a). As Dassault correctly argues, this counterclaim is barred by the statute of limitations.

Pennsylvania's legislature has imposed a one-year statute of limitations on claims for defamation, 42 Pa. C.S. § 5523(1), and this clock begins to run upon "the original printing of the

---

[1] Both Rajcevich's pleading and Dassault's motion assume that Pennsylvania law governs his common law counterclaims.

defamatory material." *In re Phila. Newspapers, LLC*, 690 F.3d 161, 174 (3d Cir. 2012). In this matter, the only communications that are pled with any degree of specificity by either party are the September and October 2022 emails between Dassault to Rajcevich's employer, CAES. As discussed, those emails included accusations that Rajcevich had pirated Dassault's software, accusations Rajcevich regards as defamatory. Even assuming he is correct about that, these emails could have only served as the basis for a defamation action if Rajcevich had raised the claim before October 2023, when the one-year statute of limitations for the claim ran. 42 Pa. C.S. § 5523(1). He did not do so. Rather, Dassault filed this action in November 2023, and Rajcevich raised his counterclaims several months later, in January 2024. Thus, to the extent the September and October 2022 emails serve as the basis for his defamation claim, the claim is barred by Pennsylvania's statute of limitations.

 Rajcevich does not dispute that these emails from Dassault fall outside of Pennsylvania's statute of limitations. He argues, however, that that the defamatory communications by Dassault continued well after October 2022, when his employer informed Dassault that he "did not utilize the CST software for any of his responsibilities at CAES." Rajcevich did not plead the substance of these communications, and his brief acknowledges as much. He argues, however, that their existence "can be reasonably [] inferred" based on the facts he did plead. First, Rajcevich points to sections of his pleadings describing an ethics investigation initiated by CAES in late summer 2023. Second, he further pled that around this same time, government investigators initiated a review of his security clearance, several years before the clearance was due for renewal. Based on these investigations, his counterclaim alleged, "on information and belief," that Dassault or its agents must have continued to communicate its (allegedly defamatory) copyright infringement allegations to CAES and government investigators throughout 2023. And, he now argues,

5

because these communications would have taken place less than a year before he brought his defamation counterclaim (*i.e.*, within the statute of limitations period), this inference is sufficient to defeat Dassault's motion to dismiss.

To start with the latter argument, Rajcevich did not plausibly allege defamatory communications between Dassault and unnamed government officials, nor may such communications be reasonably inferred from the facts he did plead. The sole well-pled fact that is at all relevant to this allegation is that "[o]n or around August 8, 2023, CAES informed Mr. Rajcevich that he was required to undergo a U.S. government security clearance renewal investigation, a few years before it was due for renewal." It is certainly possible, as Rajcevich argues, that government investigators launched their review of his clearance following defamatory communications by Dassault. But possibility is not plausibility, and defamatory communications by Dassault are just one of a vast number of possible explanations. A security clearance results from "an affirmative act of discretion on the part of the granting official," and it accordingly reflects the official's judgment about a vast range of factors, including "concerns completely unrelated to conduct." *Dep't of Navy v. Egan*, 484 U.S. 518, 528 (1988). Any one of these factors could, in principle, have triggered the review of Rajcevich's security clearance, and pleadings provide no basis to conclude that any one of them is a more likely explanation than the other. That does not meet the standard to survive a motion to dismiss: "where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.'" *Iqbal*, 556 U.S. at 679 (quoting Fed. R. Civ. P. 8(a)(2)).

For much the same reason, Rajcevich has not plausibly alleged that communications between Dassault and his employer continued after October 2022. The sole well-pled fact from

which these communications might be inferred is that in the summer of 2023, "CAES initiated an ethics investigation relating to Plaintiffs' copyright infringement allegation against Mr. Rajcevich." As before, it is certainly possible that CAES launched this investigation following repeated defamatory communications by Dassault. But that possibility is just as speculative as Rajcevich's allegation regarding his security clearance investigation. At bottom, his counterclaim "pleads facts that are 'merely consistent with'" post-October 2022 defamatory communications by Dassault. *Iqbal*, 556 U.S. at 678. This "stops short of the line between possibility and plausibility of 'entitlement to relief'" that is demanded by Rule 8. *Id.* (quoting *Twombly*, 550 U.S. at 557)).

While Rajcevich's defamation counterclaim, as currently pled, does not plausibly allege defamatory communications by Dassault that fall within the statute of limitations, "district courts 'should freely give leave [to amend] when justice so requires." *Burns v. SeaWorld Parks & Ent., Inc.*, 2024 WL 1016363, at *2 (E.D. Pa. Mar. 8, 2024) (quoting Fed. R. Civ. P. 15(a)). Accordingly, while this counterclaim will be dismissed, the dismissal will be without prejudice.

### B. Counterclaims II and III: False Light Invasion of Privacy and Tortious Interference with Business Relations

Rajcevich's second and third counterclaims are for false light invasion of privacy and tortious interference with business relations. False light invasion of privacy consists of "[1] publicity, [2] given to private facts, [3] which would be highly offensive to a reasonable person and [4] which are not of legitimate concern to the public." *Rush v. Phila. Newspapers, Inc.*, 732 A.2d 648, 654 (Pa. Super. 1999) (quoting *Strickland v. Univ. of Scranton*, 700 A.2d 979, 987 (Pa. Super. 1997)). Tortious interference, meanwhile, requires proof of "(1) the existence of a contractual or prospective contractual or economic relationship between the plaintiff and a third party; (2) purposeful action by the defendant, specifically intended to harm an existing

7

relationship or intended to prevent a prospective relation from occurring; (3) the absence of privilege or justification on the part of the defendant; (4) legal damage to the plaintiff as a result of the defendant's conduct; and (5) for prospective contracts, a reasonable likelihood that the relationship would have occurred but for the defendant's interference." *Acumed LLC v. Advanced Surgical Servs.*, 561 F.3d 199, 212 (3d Cir. 2009).

As currently pled, these counterclaims fail. The "publicity" of "private facts" that serve as the basis for Rajcevich's invasion of privacy counterclaim are the same alleged communications between Dassault and CAES that make up his defamation counterclaim. Even assuming these communications could satisfy this element of the tort,[2] invasion of privacy, like defamation, has a one-year statute of limitation in Pennsylvania. 42 Pa. C.S. § 5523(1). As just explained, Rajcevich has not plausibly alleged that any of Dassault's communications took place within this window.

The same is true of Rajcevich's tortious interference counterclaim. As a formal matter, tortious interference is "a separate and distinct action from that of libel or slander," with a longer (two year) statute of limitations. *Evans v. Phila. Newspapers, Inc.*, 601 A.2d 330, 333 (Pa. Super. 1991); *see* 42 Pa. C.S. § 5524(7). But, in cases where the "gravamen" of the tortious interference claim "is defamation by publication of a libelous report, and the claim of injury set out in each count springs from the act of publication," Pennsylvania's courts have concluded that litigants "should not be able to circumvent the statute of limitations by merely terming the claim tortious interference." *Evans*, 601 A.2d at 333. In such situations, the one-year statute of

---

[2] It is far from clear that they could. "Publicity is defined as making the matter public 'by communicating it to the public at large, or to so many persons that the matter must be regarded as substantially certain to become one of public knowledge.'" *Byars v. Sch. Dist. of Phila.*, 942 F.Supp.2d 552, 567 (E.D. Pa. 2013) (quoting *Restatement (Second) of Torts*, § 652D cmt. a)). Based on the facts currently pled by Rajcevich, the emails between Dassault and CAES do not meet this threshold.

limitations for defamation applies, regardless of the "the label applied to [the claim] by the plaintiff." *Id.*; *see McClenaghan v. Turi*, 567 F. App'x 150, 156 (3d Cir. 2014) ("[Litigants] cannot circumvent the defamation statute of limitations by repackaging the same claims under a tortious interference theory.").

That is the case here.  As in *Evans*, the alleged misconduct that serves as the basis of Rajcevich's tortious interference counterclaim is the same defamatory communications by Dassault that gave rise to his defamation counterclaim.  "[T]he one year statute of limitation for defamation cannot be circumvented by cloaking such a cause of action in other legal raiment." *Evans*, 601 A.2d at 334.  And so Rajcevich's failure to plausibly allege defamatory communications within the one-year statute of limitations for that tort also bars his tortious interference counterclaim.  His invasion of privacy and tortious interference counterclaims will thus be dismissed without prejudice.

### C. Counterclaim IV: Intentional Infliction of Emotional Distress

Rajcevich's fourth counterclaim is for intentional infliction of emotional distress ("IIED").  "To trigger liability for [this tort], '(1) the conduct [of the defendant] must be extreme and outrageous; (2) it must be intentional or reckless; (3) it must cause emotional distress; [and] (4) the distress must be severe.'" *Smith v. RB Distrib., Inc.*, 515 F.Supp.3d 311, 315 (E.D. Pa. 2021) (quoting *Hoy v. Angelone*, 691 A.2d 476, 482 (Pa. Super. 1997)).  "Pennsylvania reserves this tort for the worst conduct imaginable." *Wartluft v. Milton Hershey Sch. & Sch. Tr.*, 844 F. App'x 499, 504 (3d Cir. 2021).  A defendant's behavior must be "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized society." *Cox v. Keystone Carbon Co.*, 861 F.2d 390, 395 (3d Cir. 1988) (quoting *Buczek v. First Nat'l Bank of Mifflintown*, 531 A.2d 1122, 1125

(Pa. Super. 1987)).  Put more colloquially, IIED liability is appropriate in cases when "the recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, 'Outrageous!'"  *Kazatsky v. King David Mem'l Park, Inc.*, 527 A.2d 988, 991 (Pa. 1987) (quoting *Restatement (Second) of Torts* § 46, cmt. d)).

      The alleged conduct that serves as the basis of Rajcevich's IIED counterclaim—*i.e.*, defamatory accusations that he pirated Dassault's copyrighted software—is simply not the kind of misconduct that satisfies this demanding standard.  Though Rajcevich argues that Pennsylvania courts have recognized "a wide range of conduct sufficiently extreme and outrageous to support" an IIED claim, the cases he cites involved conduct that was markedly more egregious than the allegations at issue here, including: "intentional, wanton, and asserted[]" racial discrimination, *Shumate v. Twin Tier Hosp.*, 655 F.Supp.2d 521, 544 (M.D. Pa. 2009); pervasive workplace sexual harassment, including physical groping and the solicitation of sex for money by a supervisor, *Smith*, 515 F.Supp.3d at 320; and a total failure to supervise a known schizophrenic, resulting in his suicide attempt, *Estate of Henderson v. City of Phila.*, 62 Pa. D.&C.4th 313, 329 (Pa. Com. Pl. 2001).  The extreme nature of these cases illustrates just how high the bar is set to successfully make out a claim for IIED.  And though Rajcevich baldly asserts otherwise, none of them bears any resemblance to the conduct at the heart of his counterclaim.  Because that would be the case regardless of how this counterclaim was pled, this counterclaim will be dismissed with prejudice.

      **D.  Remaining Counterclaims**

      Rajcevich's remaining counterclaims center on his allegation that the monitoring technology used by Dassault to track unauthorized uses of its software effectively hacked his computer, violating various state and federal statutes.  Dassault moves to dismiss each of these

10

counterclaims, and in his response, Rajcevich consents to their dismissal. Accordingly, these counterclaims will be dismissed without prejudice.

An appropriate order follows.

**BY THE COURT:**

*/s/ Wendy Beetlestone*

_____
**WENDY BEETLESTONE, J.**